UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PATRICK "DANIEL" RISCILI ,

                Plaintiff,

- against -

GIBSON GUITAR CORP., ET AL.,

                Defendants.

1:06-cv-07596-RJH

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, District Judge:

       Plaintiff Patrick "Daniel" Riscili, a gay man, was fired by Gibson Guitar Corp. ("Gibson") after he complained about a coworker who mocked his sexual orientation at a company-sponsored after work function. The parties disagree about why. While Riscili sees a link between his complaints and his later termination, Gibson contends that Riscili was fired because he could not adjust to its entrepreneurial corporate culture. Gibson has moved for summary judgment. For the reasons that follow, Gibson's motion is denied as to Riscili's retaliation claim, but granted as to Riscili's discrimination claim.

**I.    BACKGROUND**

       Viewed in the light most favorable to Riscili, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), the record shows the following.

**A.    Parties**

       Riscili worked as an "entertainment representative," first at Baldwin Pianos ("Old Baldwin") and then at Gibson. (Def.'s R. 56.1 Stmt. ¶¶ 1-2.) His job principally involved lending pianos to musicians or musical venues as a means of promoting the Baldwin Pianos brand. Riscili, for example, negotiated contracts with musical venues

whereby Gibson agreed to provide free pianos in exchange for exposure to a national audience. (*See, e.g.*, Riscili Depo. 17-18, 23.) Gibson, a Delaware corporation that has its principal place of business in Nashville, Tennessee, manufactures and markets musical instruments. (*See* Notice of Removal, at 2 (Sept. 20, 2006).) The other named defendants are divisions of Gibson. (Def.'s R. 56.1 Stmt. 1 n.1.)

**B.      Gibson's Purchase of Old Baldwin**

Sometime in the fall of 2001, Gibson purchased Old Baldwin in bankruptcy. (Def.'s R. 56.1 Stmt. ¶ 2.) Shortly thereafter, Gibson hired several Old Baldwin employees including Riscili into positions similar to those they held at Old Baldwin. (*Id.* ¶ 6.) At first, Riscili worked out his apartment in New York and reported to Joe Vitti, another employee hired from Baldwin. (Riscili Depo. 46-47.) Vitti, in turn, reported to Gibson's CEO, Henry Juszkiewicz. (Def.'s R. 56.1 Stmt. ¶ 7.)

In the summer of 2002, both Riscili and Vitti began reporting to Pat Foley, the world director of Gibson's artist division. (Def.'s R. 56.1 Stmt. ¶ 8.) At about the same time, Riscili began working out of the "Hit Factory" building on 54th Street in Manhattan. (*Id.*) Although Old Baldwin had been forced to leave this building because of its failure to pay rent, Riscili, at Juszkiewicz's request, arranged for Gibson to open a showroom and offices there. (Riscili Depo. 58.) A few months after Riscili moved to the Hit Factory, he began reporting to Nina Miller, the manager of Gibson's Entertainment Relations division. (Def.'s R. 56.1 Stmt. ¶ 12.) Two other entertainment representatives, Lou Vito and Jimmy Archey, also worked out of the Hit Factory, as did Archey's wife, Diane Mahiques, Gibson's New York office manager. (*Id.* ¶ 10.) Miller apparently did not work out of the Hit Factory. (*See* Riscili Depo. 93-94.)

The record suggests that at least until the beginning of 2003, Riscili was well regarded by his peers and supervisors. On August 29, 2002, for example, Juszkiewicz sent Riscili an email in response to Riscili's "Daily Report" of the previous day that stated: "Dan: You are continually doing great work. Very much appreciated by every[one]. Thank you !!!" (Ex. C. to Decl. of Karim H. Kamal (May 5, 2008) (paragraph breaks omitted).) Nina Miller, Riscili's supervisor during the events at issue in this lawsuit, testified that Riscili "was good at doing the things he had done when he was employed by Baldwin Piano before they were acquired by Gibson." (Miller Depo. 13.)

## C.     The Events of April 2, 2003

On April 2, 2003, Riscili represented Gibson at a reception sponsored by the company to celebrate the opening of the movie *What a Girl Wants*. (Riscili Depo. 68.) Michael John LaChiusa, a librettist and client of Gibson's who is gay, accompanied Riscili to the reception. (*See id.* at 75; Ex. B to Decl. of Karim H. Kamal, at 2-3 ("LaChiusa Stmt.").)

At some point between 8:00 and 9:00 p.m., LaChiusa and Riscili were talking to Lou Vito, two or three members of a band, and the band members' "lady friends." (Riscili Depo. 78-79.) LaChiusa left the group. (LaChiusa Stmt. 2.) Shortly thereafter, LaChiusa caught Riscili's eye and indicated that something was happening behind Riscili's back. (Riscili Depo. 78-79.) Riscili turned around to find Vito imitating him in a derogatory manner. (*Id.*) LaChiusa stated that "[he] saw directly behind Danny this Vito mimicking with hand movements and facial gestures indicating in no uncertain terms and a derogatory fashion that he was mocking the fact that Danny was gay." (LaChiusa Decl. 2.) Riscili testified that Vito's imitation of him "was exaggerated and it

was very offensive . . . . [T]he joke was on me and he was doing it in front of his band, who I just met and I had been in conversation with . . . for the past, you know, five minutes." (Riscili Depo. 81.) Offended and feeling that he was in a homophobic environment, LaChiusa left the reception. (LaChiusa Stmt. 3.) After attempting to say goodbye to Juszkiewicz, Riscili also left. (Riscili Depo. 84.) He did not confront Vito, because he didn't want to make a scene in front of Gibson's clients. (*Id.* at 84.)

**D.   Subsequent Events**

When Riscili arrived at work the next day, the officer manager, Diana Mahiques, asked him how the reception went. (*Id.* at 87-88.)[1] Riscili told her what happened, but asked her not to report Vito's behavior to Gibson management since he preferred to confront Vito informally. (Riscili Depo. 93.) Despite the request, Mahiques reported the incident to Nina Miller, who was both Riscili's and Vito's supervisor. (*Id.* at 93-94.) According to Riscili, Miller called him and asked him what he intended to do. Riscili told her he would address the matter privately with Vito. Miller said she would get back to him. (*Id.* at 94, 97.) Miller testified that she has no recollection of this phone call. (Miller Depo. 57.)

Later that day, Vito came to Riscili's office and told him that he did not intend to offend him. (Riscili Depo. 95.) Riscili, thinking Vito was a "fool," told him something to the effect that "we got to work together, Lou, you know, this was offensive." (*Id.*) Vito apologized, but Riscili did not find him sincere. (*Id.* at 96.)

---

[1] Riscili refers to Mahiques as "Diane Archey" in his deposition, presumably because she is married to Jimmy Archey. There does not appear to be any dispute that "Diane Mahiques" and "Diane Archey" are the same person. (*See, e.g.*, Def.'s R. 56.1 Stmt. ¶ 10.)

News of Vito's behavior and Riscili's response spread quickly through Gibson's offices. Later in the day, a coworker from Gibson's Los Angeles office called Riscili and told him "we hear Lou's up to it again"—an apparent reference to Vito's history of offensive behavior toward gay employees. (*Id.* at 104-05.) Riscili testified that "Diane let everyone in the entire company know, guaranteed." (*Id.* at 104.)

Riscili testified that after the incident with Vito, his relationship with his coworkers and supervisors soured. As Riscili remembers it, the "dialogue" that was essential to his job ended: "I wasn't told anything. . . . . I was told nothing. They basically stopped listening to what I was saying." (*Id.* at 130; *see also id.* at 124-25.) In addition, Riscili identified three specific instances where he felt that Gibson had retaliated against him for complaining about Vito's behavior. First, beginning immediately after the incident, Riscili's superiors began to object to his "daily reports," emails in which Riscili reported on his contacts with musicians and venues. (*See id.* at 145.) At about the same time, Riscili's superiors began pressuring him to retrieve and account for pianos stored in warehouses throughout New York City that Gibson used for storage. (*Id.* at 117.) Riscili claims, however, that he was never provided with a budget to pay the warehouse's bills or to pay off warehouseman's liens on the pianos. (*See id.* at 117.)[2] Finally, in July 2003, Riscili's superiors refused to authorize the delivery of pianos for a jazz festival in Los Angeles, although Gibson had signed a contract and committed to delivering pianos to the festival. (*See* Riscili Depo. 115-16.) Gibson contends that each of these actions was supported by a legitimate nondiscriminatory,

---

[2] A warehouseman's lien is created automatically by operation of law and covers storage charges for goods stored with a bailee. *See Black's Law Dictionary* 936 (7th ed. 1999); N.Y. U.C.C. § 7-209 (McKinney 2006).

nonretaliatory business reason.  (*See* Def.'s R. 56.1 Stmt. ¶¶ 50-51 (contacts listed in Riscili's daily emails were mostly from Old Baldwin); ¶ 39 (Riscili was having difficulty negotiating with warehouses); *id* ¶ 46 (Riscili never obtained approval to loan pianos to Los Angeles festival).)

On June 17, 2003, Juszkiewicz sent Riscili an email complaining that Riscili had failed to add pop, rock or "other genre" artists to Gibson's roster.  (Ex. D. to Decl. of Karim H. Kamal.)  The email closed on an ominous note: "Either you move us forward rapidly, or we must find someone who can."  (*Id.*)  Riscili replied the same day, noting that he was working to sign Linkin Park, and that Gibson was the official piano for Christina Aguilera's and Justin Timberlake's summer tour.  (*Id.*)[3]

At about the same time, Miller, Juszkiewicz, and Pitts sent Riscili another email, which does not appear in the record, warning him that he would be terminated unless he signed two new musicians and one nationally broadcast performance within thirty days. (Def.'s R. 56.1 Stmt. ¶¶ 52-55.)   Riscili contends this goal was unrealistic, noting that "even if it was Bob Smith that played the harmonica down the street, you don't sign an artist in two weeks."  (Riscili Depo. 139.)  Because Riscili was on vacation when the email was sent (*see id.* at 127), his "probationary period" was extended by two weeks. (Def.'s R 56.1 Stmt. ¶ 55.)  On July 31, 2003, Gibson terminated Riscili.  (*Id.* ¶ 62.)

About four months later, Gibson terminated Vito.  (*See* Ex. A. to Decl. of Karim H. Kamal.)  An "employee separation notice" lists the reason for Vito's separation as

---

[3] The Court takes judicial notice that Linkin Park is a successful "nu metal" band, and that Aguilera and Timberlake are leading pop artists.  (*See, e.g.*, Scott Mervis, *Where Rock Meets Rap; Linkin Park's Projekt Revolution Tour Mixes Genres in Crunchy Style*, Pittsburgh Post-Gazette, July 17, 2008, at W-13; Jim Harrington, *Four Critics and a Dog: Music Writers Match Wits With a Golden Retriever to Forecast Tonight's Winners*, San Jose Mercury News, Feb. 11, 2007, at AE1.)

"Involuntary[—]change in personnel due to change in management." (*Id.*)  Gibson, however, rehired Vito in March 2007.  After Vito was re-hired, Henry Juszkiewicz sent an email to twenty-four recipients that noted: "There were many unfounded rumors about why Lou left Gibson.  These were just that and should not be given any credence."  (Ex. B to Decl. of Karim H. Kamal.)

### E. Procedural History

On July 27, 2006, Riscili filed a verified complaint against Gibson in the Supreme Court of New York, New York County.  (*See* Compl., *Riscili v. Gibson Guitar Corp.*, Index. No. 110422-2006 (N.Y. Sup. Ct. July 27, 2006).)  Riscili's complaint alleged claims for discrimination on the basis of sexual orientation, including unlawful retaliation in violation of the New York City Human Rights Law; negligent retention of an unfit employee; and prima facie tort.  On September 20, 2006, Gibson removed Riscili's action to this Court.  Gibson moved to dismiss Riscili's complaint, and on July 10, 2007, the Court dismissed all of Riscili's claims except his retaliation claim.  (*See Riscili v. Gibson Guitar Corp.*, No. 06 Civ. 7596 (RJH), 2007 WL 2005555, at *6 (S.D.N.Y. Jul. 10, 2007).)  Riscili subsequently filed an amended complaint that included a claim for sexual orientation discrimination under the New York City Human Rights Law.  (Second Amended Compl. (Aug. 13, 2007).)  After discovery, Gibson moved for summary judgment on the remaining two claims, arguing that Riscili has failed to proffer enough evidence to justify a trial on either of claim.

### II. DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

**A.     Riscili's Retaliation Claim**

The Court first turns to Riscili's retaliation claim under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7)(i).

Under the Human Rights Law, an employer may not retaliate "in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." *Id.*  Because of its similarity to Title VII's anti-retaliation clause, courts interpret this provision in light of federal law. *See, e.g.*, *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1007 n.3 (N.Y. 2004); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998); *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1177 (2d Cir. 1996).  In particular, courts apply the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), in analyzing claims that an employee such as Riscili has been terminated in retaliation for reporting unlawful behavior.  *See, e.g.*, *N.Y. State Dep't of Corr. Servs. v. N.Y. State Div. of Human Rights*, 861 N.Y.S.2d 494, 498 (N.Y. App. Div. 2008); *Milonas v. Rosa*, 629 N.Y.S.2d 535, 538 (N.Y. App. Div. 1995).  As relevant here: (i) Riscili must establish a prima facie case of retaliation; (ii) Gibson must then adduce a legitimate, nonretaliatory reason for its actions; and (iii) to prevail, Riscili must establish that Gibson's articulated reason is a pretext for unlawful retaliation.  *See Quinn*, 159 F.3d at 768.  Throughout the process, Riscili carries the ultimate burden of persuasion.  Fed. R. Evid. 301; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

To make out a prima facie retaliation claim, Riscili must show that (i) he participated in a protected activity known to Gibson, (ii) he suffered an adverse employment action, and (iii) there is a causal connection between the protected activity and the adverse employment action.  *Forrest*, 819 N.E.2d at 1022.  There is no dispute

- 8 -

that Gibson was aware of Riscili's complaints or that Riscili suffered an adverse employment action. Gibson contends, however, that Riscili has failed to show that he engaged in protected activity, and that there is a causal connection between any protected activity and his termination.

### 1. Protected Activity

The premise of Riscili's retaliation claim is that his phone conversation with Nina Miller was protected by law. Gibson could not, Riscili maintains, fire him for reporting Vito's boorish behavior during this conversation. Gibson's argument challenges two aspects of this contention.

First, Gibson contends that Riscili's actions were not sufficiently active, forceful, or affirmative to be protected by the Human Rights Law. While the Human Rights Law forbids retaliation against any person who has "opposed any practice forbidden under this chapter," Riscili merely told Gibson's office manager that he would address his problem with Vito informally. Thus, the argument goes, Riscili never *opposed* any practice forbidden by Human Rights Law.

While textually plausible, this argument does not survive the Supreme Court's recent decision in *Crawford v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 129 S. Ct. 846 (2009). The plaintiff in *Crawford* was fired six months after she testified during an internal investigation that she had been harassed by a co-worker. 129 S. Ct. at 849-50; *see Crawford v. Metro. Gov't of Nashville and Davidson County, TN*, 211 F. App'x 373, 375 (6th Cir. 2006) (reciting additional facts). The plaintiff, however, never affirmatively complained to her employer about harassment. Instead, the plaintiff's conduct could be characterized as completely passive:

the investigation at which she testified was instigated by another coworker, and the plaintiff only testified because her employer asked her to. *Crawford*, 129 S. Ct. at 849.

The Court held that while the plaintiff "did not claim to have instigated or initiated any complaint prior to her participation in the investigation," *id.* at 850 (internal quotation marks omitted), her testimony nonetheless was protected by law. Under Title VII's "opposition" clause, it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a) (2006). The Court reasoned that because "oppose" is undefined, the term carries its ordinary meaning, which includes "confront[ing]," "resist[ing]," and "withstand[ing]" unlawful actions. 129 S. Ct. at 850. Under this definition, the plaintiff's testimony—"an ostensibly disapproving account of sexually obnoxious behavior toward her by a fellow employee [which] antagonized her employer to the point of sacking her on a false pretense," *id.* at 850-51—was protected by law.[4] The Court accordingly held that the plaintiff was entitled to proceed to trial, and rejected the lower court's contrary ruling, which "protect[ed] an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question." *Id.* at 852.

A jury could find Riscili's statements protected on this very theory. As in *Crawford*, Riscili recounted an "ostensibly disapproving account of sexually obnoxious

---

[4] In a concurring opinion, Justice Alito, joined by Justice Thomas, noted his understanding that the Court's holding did not extend beyond the context of internal investigations. *See id.* at *6. After reviewing the dictionary definitions the Court relied on, Justice Alito noted that "oppose" is not always used to mean, "to be hostile or adverse to, *as in opinion*." 129 S. Ct. at 854. Justice Alito therefore endorsed the definition of "oppose" proposed by plaintiff-petitioner: "taking action (including making a statement) to end, prevent, redress, or correct unlawful discrimination." *Id.*

- 10 -

behavior toward [him] by a fellow employee" that allegedly provoked his termination. And, as in *Crawford*, Riscili reported this behavior only because his supervisor asked him about it. To the extent that Gibson argues Riscili's conduct was insufficiently "oppositional" to be protected by law, its argument fails.

The second, closely related challenge to Riscili's claim that he engaged in protected activity goes to whether Vito's alleged one-time harassment supports a reasonable belief that the law was violated. To prevail on a retaliation claim, an employee who has been fired after complaining about another employee's sexually obnoxious behavior must show that he had "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001). This doctrine contains both subjective and objective components: the plaintiff must actually have believed that he had suffered illegal discrimination, and that belief must have been objectively reasonable. *See Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998); *Quinn*, 159 F.3d at 769.

The rationale for the doctrine is simple and sensible. While the Human Rights Law's (and Title VII's) anti-retaliation provision sweeps broader than the law's substantive prohibitions, *see Quinn*, 159 F.3d at 769, the provision's reference to "practice[s] forbidden under this chapter" is naturally read to require some relationship between the actions an employee complains about those which are illegal as a matter of substantive law. *See Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1999); *Benson v. Little Rock Hilton Inn*, 742 F.2d 414, 421 (8th Cir. 1984) (Heaney, J., dissenting); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978).

Were it otherwise, the law's anti-retaliation provision would prohibit retaliation for an employee's opposition to *anything*, rather than retaliation for an employee's opposition to discrimination on the basis of a protected characteristic.

The issue here is whether Vito's single alleged act of harassment, which the Court previously held did not violate the Human Rights Law's substantive prohibitions, *Riscili*, 2007 WL 2005555, at *2, is capable of supporting a reasonable belief that the law was violated. In general, a single offensive remark does not violate the law. *See Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (noting that while stray remarks do not constitute sufficient evidence to make out a case of employment discrimination, remarks can no longer be deemed "stray" if other indicia of discrimination are properly presented). Drawing on this principle, some courts have held that that a single remark cannot support a reasonable belief that the law has been violated. The Fourth Circuit, for instance, has held that no objectively reasonable person could believe that he was working in a hostile work environment based on a single, albeit shockingly racist, remark. *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 336, 341 (4th Cir. 2006). Other courts have taken the opposite view, holding that a single offensive remark may support a reasonable, if mistaken, belief that the law has been violated. *See, e.g.*, *Alexander v. Gerhardt Enters., Inc.*, 40 F.3d 187, 195 (7th Cir. 1994). To date, the Supreme Court has declined to resolve this conflict in the circuits, despite the frequency with which the issue arises in the lower federal courts. *See, e.g.*, *Jordan v. Alternative Resources Corp.*, 127 S. Ct. 2036 (2007) (denying certiorari).

The tension in the caselaw is well illustrated by the Second Circuit's decision in *Reed*, 95 F.3d 1170. The plaintiff there was fired after complaining to her employer

about two sexually obnoxious comments made by a co-worker.  A jury returned a verdict in favor of the plaintiff, and defendants argued that the co-worker's remarks were inadequate to support a reasonable belief the law had been violated.  Upholding the verdict, the court noted that while the plaintiff "likely would not have passed the good faith reasonableness test" had she only offered evidence of a single comment, *id.* at 1179 (alterations omitted), the trial record contained evidence of two comments as well as testimony to the effect that the plaintiff was not getting proper credit for her contributions to the company's bottom line.  *Id.* at 1179-80.  In a footnote, however, the court reiterated that its decision should not be read to suggest that "one comment, standing alone, could support a reasonable belief that an employee was suffering unlawful, discriminatory employment conditions."  *Id.* at 1179 n.12.

One could reasonably question whether *Reed*'s one comment/two comment distinction creates a workable rule; but the issue is besides the point in light of the evidence here.  Unlike the typical "single comment" case, Riscili did not complain about Vito's behavior of his own volition.  Instead, his supervisor Nina Miller called him after learning about Vito's alleged harassment from a third-party, presumably because of the possibility that the law (or at the least company policy) had been violated.  In such circumstances, Riscili justifiably could have believed that his employer thought the law had been violated.  And for this reason, a jury could rationally infer that Riscili's belief the law was violated was reasonable.  An employer's unprovoked query, "Tell me about how *X* harassed you," may support a reasonable belief the law has been violated.  If a jury so finds, the employee's response is protected by law.

This conclusion is not only supported by the facts alleged in this case, but consistent with the purposes of the "good faith-reasonable belief" doctrine. As noted, *see supra* p. 11, the doctrine limits the circumstances in which an employee can claim legal protection for his complaints about another employee's behavior. The doctrine thus gives effect to controlling statutory language and serves the broader purpose of preventing anti-discrimination law from "expanding into a general civility code." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see Benson*, 742 F.2d at 421 (Heaney, J., dissenting) ("The objective 'reasonable belief' standard is apparently an effort to distinguish legitimate informal opposition conduct from unreasonable, insubordinate, or disruptive conduct in the workplace, recognizing an employer's interest in selection and control of its personnel."). Where the employer's conduct indicates that illegal activity may be afoot, these policy considerations are inapt. As *Crawford* recognizes, an employee's response to questions posed by his employer is just as capable of "opposing" illegal conduct as an ordinary complaint to the H.R. department. And, where an employer initiates an investigation, there is little risk of over-protecting employee conduct. After all, the employer may choose in the first instance whether to elicit protected speech.

For these reasons, the Court holds that where as here an employee responds to his employer's questions about potentially illegal activity, his responses are protected under the Human Rights Law. To the extent Gibson challenges whether Riscili reasonably believed that Vito's behavior violated the law, the matter is for the jury to decide.

*ii. Causal Connection*

Gibson next argues that Riscili has failed to show a causal link between his complaints about Vito's behavior and his termination. Specifically, Gibson contends that (i) Riscili admitted he does not think that Gibson fired him in retaliation for his complaints, and (ii) as a matter of law, temporal proximity of four months is too long to support an inference that Riscili was fired in retaliation for complaining about Vito. Neither argument supports summary judgment.

Riscili's purported admission comes 155 pages into his deposition. There, Riscili testified that he believes Gibson fired him because, "I was being brought on my first trial run . . . and I was tainted by one of their employees." (Riscili Depo. 155.) This statement provoked the following exchange:

> Q: [D]id anyone ever tell you that this was the reason that things changed or not changed; yes or no?
>
> A: One more time.
>
> Q: *Did anyone ever tell you that that incident was the reason that things were being done differently?*
>
> A: *No.*

(*Id.* (emphasis added).) Based on this exchange, Gibson concludes that "plaintiff asserts that he was terminated because of the alleged incident with Vito itself and his *inability to get along with Vito*, not because of any complaint he made about Vito or the incident." (Def.'s Mem. 22 (emphasis added).) Gibson's conclusion, however, is only of one of the inferences a jury could permissibly draw from this exchange. Viewing the facts in the light most favorable to Riscili, a jury might also conclude that Riscili was fired because he complained about Vito's actions. Which inference to draw is a question for the jury. *See, e.g.*, *Rodriguez v. City of New York*, 72 F.3d 1051, 1064 (2d Cir. 1995) (summary

judgment inappropriate "when there exist disputes as to related facts that would permit competing inferences to be drawn as to the meanings of the undisputed events").

Gibson's "four months" argument is no stronger. Gibson accurately notes that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County Sch. Dist.*, 532 U.S. at 273. But Riscili has offered evidence from which a jury could conclude that immediately or almost immediately after he complained about Vito, Gibson began shutting him out of the company's business. (*See, e.g.*, Riscili Depo. 196 ("Same reports, same procedures as were being done in January and February and March of that year, even into April, and from that point on, after the incident, nothing, nothing pleased them, all you have to do – they're all in the file, all you have to do is read back, very hostile correspondence, nothing seems to please them."); *id.* at 107 ("This [April and May 2003] is the time that money really became very tight. . . . And my request for vendors to be paid [were denied because] there's no monies, you need to manage this better, you need to collect monies that way better.").)[5] Assuming as the Court must that a jury will credit Riscili's testimony, the fact that it took four months for Gibson's retaliatory scheme to play itself out does not defeat Riscili's claim.

  2. *Gibson's Nonretaliatory Rationale*

Turning to the second and third prongs of the *McDonnell Douglas* analysis, *see Quinn*, 159 F.3d at 768, Gibson contends that it has offered legitimate nonretaliatory reasons for firing Riscili, and that Riscili has made an inadequate showing that those

---

[5] Riscili's testimony makes clear that he believes this justification—lack of financing—was pretextual.

reasons are pretextual.  Gibson's principal argument is that Riscili could not adapt to its leaner, more entrepreneurial business culture.  (*See* Def.'s Mem. 17-19.)  A declaration submitted by Donald Pitts, for example, points out that although Pitts and Miller "spoke to Riscili many times about the need to help us prioritize placement of [pianos]," Riscili "seemed . . . unable to operate in such an environment where such out of the box thinking was necessary."  (Decl. of Donald Pitts ¶ 14 (Mar. 31, 2008).)  Pitts further notes that Riscili "did not understand that it was important that he communicate [the] need for instruments early so that we could prioritize needs."  (*Id.* ¶ 15.)

Assuming that an employee's failure to adapt to a corporation's culture is a legitimate nonretaliatory reason for terminating him, Riscili has introduced sufficient evidence that Gibson's proffered reason for firing him is a pretext to survive summary judgment.  First, the testimony of Diane Mahiques contradicts Gibson's contention that Riscili was having difficulty adapting to its culture.  (*See* Mahiques Depo. 20-23.)  Second, Riscili's testimony is generally inconsistent with that of Gibson's key witnesses'.  *Compare, e.g.*, Miller Depo. 33 *with* Riscili Depo. 100 (conflict as to whether Miller called Riscili on April 3, 2003); Miller Depo. 46 *with* Riscili Depo. 100 (conflict as to whether Miller was aware of Riscili's complaint); Miller Depo. 46 *with* Mahiques Depo. 15 (same).).  And third, as Riscili points out, the only *documented* complaints about Riscili's performance at Gibson postdate the critical date of April 3, 2003.  (Def.'s Mem. 9.)

Based on this evidence, a jury could reasonably find that Gibson's proffered reasons for firing Riscili are pretextual.  A jury might for example credit Mahiques' testimony over Pitts'.  Or, it might conclude that Gibson's witnesses generally should not

- 17 -

be credited, on the theory, *falsus in uno, falsus in omnibus*.  Either way, there is a genuine issue of material fact going to Gibson's bona fides.  Gibson's motion for summary judgment on Riscili's retaliation claim will therefore be denied.

**B.     Riscili's Discrimination Claim**

While the record contains sufficient evidence for Riscili's retaliation claim to proceed to trial, this does not hold true for Riscili's discrimination claim.  To establish a prima facie case of discriminatory employment action under the Human Rights Law, Riscili must show that (i) he is a member of a protected class; (ii) he was qualified to hold his position; (iii) he was terminated from employment or suffered another adverse employment action; and (iv) the discharge or other adverse action occurred under circumstances giving rise to an inference of discrimination.  *Forrest*, 819 N.E.2d at 1006.  Only the fourth element—whether the circumstances give rise to an inference of discrimination—is in dispute here.

Riscili relies on two theories to support an inference of discrimination: first, that Vito's actions alone show Riscili was fired for discriminatory reasons; and second, that the same suspicious sequence of events underlying his retaliation claim supports an employment discrimination claim.  Neither withstands scrutiny.

With respect to the first theory, the Court previously held that Vito's alleged behavior, though obnoxious, did not constitute an adverse employment action under the Human Rights Law.  *Riscili*, 2007 WL 2005555, at *2.  While it might be argued that Vito's behavior revealed a larger culture of discrimination at Gibson, this suggestion finds little support in the record.  Riscili, for example, testified that soon after the incident with Vito, a co-worker from Gibson's Los Angeles' office called Riscili and told him, "we hear Lou's up to it again"—a remark that hardly bespeaks a corporate culture

pervaded with homophobia. (Riscili Depo. 104.) And when questioned, Riscili could not identify any discriminatory actions by Gibson's employees aside from Vito's offensive behavior at the reception. (Riscili Depo. 192-93.) To the extent Riscili's discrimination claim depends solely on Vito's remarks, it fails.

With respect to the sequence of events leading to Riscili's firing, it is enough to note that Riscili's coworkers and superiors apparently knew of his sexual orientation long before the incident with Vito. Riscili testified that his supervisors both at Baldwin and Gibson "absolutely" knew he was gay. (*See, e.g.*, Riscili Depo. 86, 168.) The relevant timeline, then, is that Riscili was fired long after his supervisors became aware of his sexual orientation, and only after he complained about Vito's behavior at the reception. Without further evidence that Gibson discriminated against Riscili on the basis of his sexual orientation, the record does not support such an inference. When all is said and done, this is a retaliation case.

## III.  CONCLUSION

Gibson's motion for summary judgment **[24]** is denied as to Riscili's retaliation claim, but otherwise granted. The parties are directed to submit a joint pretrial order within thirty days.

SO ORDERED.

Dated: New York, New York
       March **26**, 2009

*/s/ Richard J. Holwell*
Richard J. Holwell
United States District Judge